IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

THOMAS LEE HANSEN, SR.,

        Petitioner,

vs.

MIKE HEINRICY,[1]

        Respondent.

4:19-cv-00041-JEG-RAW

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS
CORPUS

On May 1, 2011 Thomas Hansen, Sr. shot and killed a woman he was living with, Sharon Gerot, at their rural Riverside, Iowa residence. Hansen was charged with first-degree murder. He admitted firing the fatal bullet, but claimed he only intended to scare Gerot, not harm her. He consistently claimed her death was accidental. Hansen's trial counsel presented an involuntary manslaughter defense. Following jury trial, Hansen was convicted of second-degree murder in violation of Iowa Code § 707.3. He received the statutorily mandated sentence of 50 years in prison without eligibility for parole until he served 70 percent of the sentence, 35 years. *Id.* §§ 707.3(2), 902.12(1)(a). Hansen was 71 years old.

The conviction was affirmed by the Iowa Court of Appeals on direct appeal. *State v. Hansen*, 847 N.W.2d 612 (Table), 2014 WL 1495493 (Iowa Ct. App. April 16, 2014) (*Hansen I*). The Iowa Supreme Court denied further review. A subsequent state post-conviction relief (PCR) application was denied and affirmed by the Iowa Court of Appeals. *Hansen v. State*, 909 N.W.2d

---

[1] The Petition alleges Petitioner is serving his state prison sentence at the Iowa Medical and Classification Center in Coralville, Iowa. (Pet'n [1] at 3). Public information from the Iowa Department of Corrections indicates that in July 2020 Mike Heinricy succeeded original respondent James McKinney as Warden of the facility. Mr. Heinricy is automatically substituted as Respondent. Fed. R. Civ. P. 25(d).

444 (Table), 2017 WL 6027770 (Iowa Ct. App. Nov. 22, 2017) (*Hansen II*). The Iowa Supreme Court denied further review.

Hansen filed his Petition for a Writ of Habeas Corpus in this Court on February 4, 2019. 28 U.S.C. §2254(a). He alleges he was deprived of the effective assistance of counsel at his criminal trial in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. The Petition was referred to the undersigned for Report and Recommendation. 28 U.S.C. § 636(b)(1)(B). The Petition is submitted on the briefs and record of trial, postconviction relief, and appellate proceedings.[2]

## I.

## THE SHOOTING, TRIAL, AND DIRECT APPEAL

## A.

Hansen testified at his criminal trial. Unless otherwise indicated, what follows is his rendition of events leading up to the shooting.[3] The temporal aspects of his testimony about the sequence of events on May 1, 2011 are not very clear. They span a period of time from about 10:00 a.m. to 4:00 p.m. that day.

Hansen met Sharon Gerot at a conference in 1999 or 2000. (Tr. 705). They developed a romantic relationship. Gerot moved into Hansen's Riverside, Iowa home in about 2002 or 2003.

---

[2] Petitioner's counsel requested oral argument. The briefs on both sides thoroughly present the matters in dispute. The Court does not believe oral argument would materially assist in determination of the cause.

[3] The trial, PCR and appellate records have been filed in various docket subparts. The trial transcript is in Docket No. 7-1. The PCR transcript is in Docket No. 7-7 except for the deposition of Hansen's PCR expert, Dr. Craig B. Rypma, which is in Docket No. 8-2 at pp. 109-185. Docket No. 8-1 is the direct appeal appendix. Docket No. 8-2 is the PCR appendix filed in connection with the PCR appeal to the Iowa Court of Appeals. In citing to the trial, PCR and Rypma deposition transcripts the Court will give only the original transcript page for each, for examples: Tr. 480, PCR Tr. 40, Rypma Tr. 5. Unless otherwise indicated, citation to other record material is to the Docket No. and page where the reference may be found, for example: (PCR Ruling, App'x 101 [8-2]).

(Tr. 706). Gerot was about 15 years younger than Hansen, and at the time of the shooting weighed 204 pounds to Hansen's 144, a fact allegedly bearing on physical abuse Hansen claimed to have suffered at her hands. (Tr. 457 (Dr. Nashelsky), 710). According to Hansen, for a period of about seven years leading up to the shooting he had endured frequent verbal and physical abuse visited on him by Gerot, the latter characterized by incidents in which she variously choked, grabbed, shoved, struck, and spat on him. (Tr. 722-23). Four or five times she brandished a firearm. (Tr. 723). Hansen said that in response he typically remained passive to avoid exacerbating the situation. (Tr. 723). He described Sunday, May 1, 2011, the day of the shooting, as probably the worst day he had experienced with Gerot. (Tr. 724).

Hansen retired in 2007. Each summer he and Gerot traveled to various state and national parks for seasonal employment. (Tr. 704-05). In May 2011 they were scheduled to work at Yellowstone National Park. In fact, Hansen had planned to be at Yellowstone by May 1. Gerot was to arrive later, on May 20. (Tr. 708-09). Hansen's departure was delayed by Gerot's demands that he first complete a number of household tasks she was upset had not been accomplished; cleaning the house, cleaning closets out, washing clothing and other things. (Tr. 708, 713). Hansen agreed to further delay his departure to May 2.

Hansen rose early on May 1 and attended to various chores on their acreage, which included feeding horses and other animals. (Tr. at 706). Gerot got up at about 9:00 or 10:00 a.m. She was in a bad mood about the jobs she had assigned to Hansen. (Tr. at 707-08). She complained about how "terrible things were" and told Hansen he was "worthless." (Tr. at 708). Also, Hansen had drafted a letter to the local sheriff about their impending absence which Gerot did not like and complained about. (Tr. 708-09).

Hansen went into the den to revise the letter to the sheriff. When he emerged he came in contact with Gerot who had exited the bathroom. A "push-shove" match ensued with Hansen and

Gerot both falling down. (Tr. 709). Hansen went into the kitchen, Gerot to her bedroom. After a short time Gerot came out brandishing a .22 caliber handgun Hansen had given her. (Tr. 710). She waved it around, telling Hansen she could put a bullet in his head. (Tr. 711). Hansen said nothing, Gerot returned to her bedroom. (Tr. 712).

Things settled down for a while. The two had coffee in the kitchen together. At some point, Gerot again became agitated about the jobs Hansen was to complete. (Tr. 713). She also expressed concern about the person they had arranged to take care of their home while they were away, fearing he would let members of Hansen's family in the house. (Tr. 714).

Hansen testified he did not respond to Gerot's complaints. (Tr. at 715). Things started getting physical. Gerot grabbed Hansen's shirt collar, twisting it to choke him, while saying "you call yourself a man, you're worthless" accompanied by similar disparaging comments. (Tr. 715). Gerot put on a hat with a large brim, walked up to Hansen and "smacked" him with the brim across the bridge of his nose. (Tr. 716). She challenged him: "Well, aren't you going to do something" and cursed him. (Tr. 716). Gerot got a glass of water and ice cubes from the refrigerator and threw the water and cubes in Hansen's face. (Tr. 717).

Hansen testified he remained stoic in the face of these assaults. Gerot returned to her bedroom to get dressed to go outside and do some mowing while Hansen did some cleaning and dishwashing. (Tr. 717-18). When Gerot came out of the bedroom she talked again about the work Hansen had to complete before he left for Yellowstone. (Tr. 718). Hansen had put on an old flannel shirt. Gerot again wrapped her hand around the collar tight enough to choke him. (Tr. 718). Then, in Hansen's words, "she just spit in my face and let go and pushed me backwards and told me what a worthless piece of shit I am." (Tr. 718).

Gerot went out the kitchen door to the garage. Hansen followed behind telling her to be careful because the electric fence was energized. (Tr. 719). Gerot turned saying: "Don't you dare

follow me out the door." (Tr. 734). Two vehicles were in the garage, a pickup and an SUV, both "nose into the garage." (Tr. 720). Gerot pushed Hansen backwards. He fell to his knees striking the pickup. (Tr. 719, 721). Gerot then got on a riding mower parked outside the garage door and left to mow the horse pasture. (Tr. 719).

Hansen testified that as he stood up he thought he had to get Gerot to leave. (Tr. 724). He was angry. (Tr. 740). A loaded .40 caliber Smith and Wesson handgun was near the back of the pickup on the side of the garage, holstered in a "tote." (Tr. 724, 737, 747).[4] Hansen removed the handgun from the tote and holster thinking he would scare Gerot with the gun and she would leave. (Tr. 724). Armed with the handgun, Hansen went behind the vehicles, walked 12 to 14 feet, went into the house through the kitchen door, walked past a washing machine, around the kitchen counter to an open sliding patio door. (Tr. 724, 739-40). He saw Gerot mowing along a fence line. (Tr. 740). Hansen raised the handgun and fired a shot in Gerot's direction not, he said, aiming at her. (Tr. 742). He testified he did not intend to shoot Gerot, only to scare her in the hope that she would go away. (Tr. 724, 726-27).

Hansen saw Gerot "flop backwards" on the mower. (Tr. 725). The mower kept going for a brief period with Gerot on it. Hansen went into the house and called 911 but was unable to get through. (Tr. 725). He called his son, Thomas Hansen, Jr., and told him he needed help. (Tr. 725). Hansen heard the mower stop, went back outside, saw Gerot lying beside the mower and his neighbor, Todd Hahn, approaching. (Tr. 725).

At about 3:40 p.m. Todd Hahn was driving past the Hansen residence when he noticed someone on a lawn mower "with their head and hands snapped back." (Tr. 399, 402). Hahn backed up and pulled into the Hansen driveway. (Tr. 402). He ran to the mower and a body, now on the

---

[4] Law enforcement later found the tote by the right rear tire of the pickup. (Tr. 496).

ground. (Tr. 403-04). Hansen walked up and told Hahn not to touch the body. (Tr. 404). Hansen told Hahn to call the cops. At some point Hansen said to Hahn: "I shot 'um." (Tr. 405). In his testimony Hansen said he told Hahn he shot Gerot. (Tr. 725). Hahn called 911 to report the shooting. (Tr. 409). Hahn described Hansen as calm though he did not seem himself, it was like he "snapped." (Tr. 408, 415).

Hahn made his 911 call at about 3:45 p.m. (Tr. 419). State troopers and a sheriff's deputy arrived. Hansen was taken into custody. As he was being escorted to a sheriff vehicle, Iowa State Trooper Allen Konecne heard Hansen say to someone in the area: "I just couldn't take it anymore." (Tr. 421).

Later that evening Hansen gave a recorded statement to Iowa Division of Criminal Investigation (DCI) Special Agent Jeff Uhlmeyer. Hansen's statement was generally consistent with his trial testimony. He said he did not intend to shoot Gerot, but only to scare her. (Hansen Stmt., App'x 326 [8-1]).[5] He said his blood was boiling and he was seeing red. (PCR Tr. 11).

Gerot died of a perforating gunshot wound to her head. Autopsy found the bullet entered her left temple and exited the right side of her head just behind her ear causing extensive damage to her brain. (Tr. 450).

The mower was moving with Gerot on board when she was shot. It continued to move for a brief period afterward with Gerot still seated on the mower. Investigation revealed the mower went around in a circle at least once before Gerot fell off. (Tr. 438, 510). This resulted in a circular pattern of blood spatters twenty-three feet in diameter making it impossible to determine precisely where Gerot was when she was shot. (Tr. 469). The mower came to a stop sixty-nine feet from the

---

[5] Hansen's statement was received in the trial record as a defense offer of proof. (Tr. 694-95). The trial court sustained the State's hearsay objection to the statement. (Tr. 691-92).

6

sliding patio door. (Tr. 475). The closest blood was about fifty-nine feet from the patio door, (Tr. 470-71), the furthest about eighty- to eighty-four feet from the door. (Tr. 473).

**B.**

Hansen was charged with first-degree murder. First-degree murder incorporates several lesser included offenses, as relevant here, second-degree murder, voluntary manslaughter, and involuntary manslaughter. As Hansen had admitted shooting Gerot, the defense necessarily focused on a lesser included offense. Second-degree murder was not a candidate because with its mandatory minimum thirty-five-year period of imprisonment before eligibility for parole, conviction would effectively be a life sentence for one of Hansen's age. As a practical matter, that left voluntary or involuntary manslaughter as potential defenses, neither of which incorporate the first- and second-degree murder element of "malice aforethought." *See* Iowa Code §§ 707.1, 707.3(1).

Involuntary manslaughter is a crime of recklessness. *State v. Rohm*, 609 N.W.2d 504, 511 (Iowa 2000) (citing *State v. Connor*, 292 N.W.2d 682, 686 (Iowa 1980) and *State v. Inger*, 292 N.W.2d 119, 123 (Iowa 1980)). It applies when a person recklessly but unintentionally causes the death of another. Iowa Code § 707.5(1)(a), (b). If the jury had found involuntary manslaughter the conviction would at most have been a Class "D" felony punishable by imprisonment of up to five years.[6] *Id.* subpara (1)(a); § 902.9(1)(e).

Voluntary manslaughter is one step up on the penal scale. It occurs when a

> . . . person causes the death of another person, under circumstances which would otherwise be murder, if the person causing the death acts solely as a result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person and there is not an interval between the

---

[6] The trial court submitted both the "public offense" and non-public offense versions of involuntary manslaughter, the latter an aggravated misdemeanor. Iowa Code § 707.5(1)(a), (b); (Jury Inst. 31, 33, App'x 315, 317 [8-2]). The submitted public offense was recklessly pointing a firearm at Gerot unintentionally causing her death. (Jury Inst. 31, App'x 315 [8-2]).

provocation and the killing in which a person of ordinary reason and temperament
would regain control and suppress the impulse to kill.

Iowa Code § 707.4(1). As the trial court instructed, the first element of voluntary manslaughter

in Hansen's case required a finding that he "intentionally shot" Gerot. (Jury Inst. 29, App'x 313

[8-2]). The crime does not require a specific intent to kill, rather the requisite intent is shown if

the act which resulted in death is intentionally committed. *State v. Ceretti*, 871 N.W.2d 88, 93

(Iowa 2015). Voluntary manslaughter is a Class "C" felony punishable by imprisonment of up to

ten years. Iowa Code §§ 707.4(2), 902.9(1)(d).

Hansen was represented at trial by public defender attorneys John Robertson and Dennis

Cohen, the latter with over twenty years' experience as a public defender. (PCR Tr. 7). Robertson

was lead counsel. (PCR Tr. 8).[7] The defense theory was involuntary manslaughter which his

attorneys believed was consistent with Hansen's statement to DCI Agent Uhlmeyer. (PCR Tr. 9,

11). *See Hansen II*, 2017 WL 6027770 at *1. Hansen had told Uhlmeyer, and "on repeated

occasions" his attorneys, that he did not intend to shoot Gerot. (PCR Tr. 51, 55).

Hansen had had a notable and distinguished local career as a fireman, fire safety instructor,

and emergency management director in Johnson County. He had been a member of the Iowa City

Fire Department for twenty-seven years, rising in the ranks from recruit firefighter, to lieutenant,

to battalion chief, to, ultimately, fire marshal. (Tr. 699). Following retirement at age fifty-five, and

a brief interval, in 1996 Hansen went to work in the Emergency Management Department of

Johnson County. (Tr. 702). Before long he became director of the department, in which capacity

he served eleven years before retiring from that position in 2007. (Tr. 703-04).

---

[7] Robertson was unavailable for PCR testimony. He died shortly after Hansen was sentenced.
(PCR Tr. 8).

In addition to Hansen's own testimony, defense counsel called numerous character witnesses in an effort to convince the jury that Hansen's story should be believed and he was not the sort of person who would intentionally harm anyone. The character witnesses were (1) Hansen's four sons and former wife Sandra Hansen, (2) seven neighbors, fellow firefighters, and/or persons familiar with his work as county emergency management director all of whom had known Hansen for many years, and (3) the former priest at his church. These witnesses testified variously that Hansen was honest,[8] non-violent and/or even-tempered,[9] hard-working, responsible and respected,[10] and a valued member of his church.[11]

The jury nonetheless found Hansen guilty of second-degree murder and he was sentenced accordingly.

## C.

On direct appeal Hansen unsuccessfully argued a number of trial errors and asserted the evidence was insufficient on the second-degree murder element of malice aforethought. *Hansen I*, 2014 WL 1495493 at *1. On the insufficiency issue, Hansen contended the evidence established only that he had acted "in the heat of passion without an understanding of the nature of his acts or their possible consequences." *Id.* at *5 (quoting argument). The Court of Appeals rejected this, finding there was "substantial evidence from which a jury could conclude Hansen acted with malice aforethought." *Id.* In addition to Hansen's admitted anger and statement to law enforcement that he could not take it anymore, the court found it significant that

> [r]ather than leave when Gerot began to mow the yard, Hansen retrieved a handgun from its holster and a tote in the garage. He walked through the garage and into the house. He passed through the kitchen to the patio doors and fired . . . .

---

[8] *See e.g.* Tr. 560, 574, 603, 632, 640, 653, 671, 676, 681.
[9] *See e.g.* Tr. 558, 574, 584, 597, 606, 624, 633, 653, 665, 82, 676, 681.
[10] *See e.g.* Tr. 561, 671, 581, 592, 602, 623-24, 633, 653, 662, 670, 672, 675.
[11] *See e.g.*, Tr. 637, 678-79, 681.

*Id.* The circumstances, said the court, "provided ample evidence from which a jury could find that the defendant acted with a fixed purpose or design to do physical harm to Gerot." *Id*. The conviction was affirmed.

## II.

### ISSUES PRESENTED – STATE PCR PROCEEDINGS

Hansen contends his trial counsel were ineffective in three ways:

(1) Counsel failed to investigate or attempt to locate an expert to testify about the abuse he suffered and his mental state at the time of the shooting;
(2) Counsel failed to call lay witnesses known to them to testify about the history of abuse he endured from Gerot;
(3) Counsel failed to investigate or attempt to obtain Gerot's medical and pharmacological records, and present expert testimony concerning them.

(Pet'r's Brief [10] at 1-2). There is no preservation issue. These specifications of ineffectiveness were submitted to the state PCR trial court and the Iowa Court of Appeals, but with an emphasis which may explain the context in which the Iowa courts considered them.

By deposition received in connection with the PCR evidentiary hearing, Hansen's PCR expert, clinical and forensic psychologist Dr. Craig Rypma, testified that Hansen acted in the heat of passion when he shot Gerot. Rypma would have so testified had he been called as a witness at the criminal trial. (Rypma Tr. 14, 30-32). Depending on the circumstances, a homicide committed in the heat of passion may be voluntary manslaughter. In his PCR post-hearing brief, Hansen argued his attorneys were ineffective for failing to present lay and expert evidence that he had acted in the "heat of passion." (Post-hearing Brief, App'x 83 [8-2]). The claim was repeated in Hansen's PCR appellate brief. (Appellate Brief [7-8] at 2). This apparently led both courts to view the overarching ineffectiveness claim to be that defense counsel should have presented a defense of voluntary manslaughter rather than involuntary manslaughter. (PCR Ruling, App'x 100 [8-2]); *Hansen II*, 2017 WL 6027770 at *1. Both courts found foregoing of voluntary manslaughter as a

defense in favor of involuntary manslaughter was a reasonable strategic decision. Said the PCR

trial court:

> The Court does not find any of these claims amount to ineffective assistance
> of counsel. The actual defense that was presented to the jury was one that was
> consistent with and in fact based upon Hansen's own version of the event, that he
> still maintains as being true today, that the shooting was accidental. Hansen has
> consistently stated he did not mean to shoot and kill Gerot, as he only wanted to
> frighten her and the killing was an accident. His attorneys, realizing that Hansen
> was convincing and consistent, developed a strategy based upon involuntary
> manslaughter.
> That strategy could have been undermined if they had argued Hansen did
> not mean to shoot Gerot, but if the jury found that he actually did mean to shoot
> her, even though he said he didn't, then you, the jury, should find him guilty of
> voluntary manslaughter. This was not the strategy the defense attorneys undertook,
> and it is within the wide range of reasonable.

(PCR Ruling, App'x 100-01 [8-2]). More specifically, the PCR trial court added that the decisions

not to retain an expert or obtain Gerot's medical records were "consistent with" the defense

strategy. (PCR Ruling, App'x 101 [8-2]).

For its part, the Iowa Court of Appeals held "counsel made a reasonable decision to forego

a voluntary manslaughter defense in order to pursue an involuntary manslaughter defense."

*Hansen II*, 2017 WL 6027770 at *3. The court observed that a voluntary manslaughter defense

would have been complicated by the fact Hansen had repeatedly said he did not intend to shoot

Gerot. The court quoted defense attorney Cohen's PCR testimony:

> Further complicating the voluntary manslaughter defense was the fact that
> Hansen "repeatedly" said that he did not intentionally shoot Gerot, and "[h]e said
> it with passion." Counsel determined that although "there were nice facts in this
> case that could possibly support a voluntary manslaughter theory," they "could not
> have intentionally coached Mr. Hansen to completely contradict everything that he
> had passionately told us earlier and that he also told [law enforcement] hours after
> the shooting." If they pursued the voluntary manslaughter theory, "the State could
> always present [the] statement from Tom Hansen saying: 'Well, I didn't intend to
> shoot her.'"

*Hansen II*, 2017 WL 6027770 at *3 (quoting PCR Tr. 51, 56-57).

Given their view that the ineffectiveness claims targeted the choice of what defense to present,  the PCR trial court and the Iowa Court of Appeals rejected Hansen's three specifications of ineffectiveness now before this Court without, in the case of the Court of Appeals, expressly addressing them, and in the case of the PCR trial court, with limited explanation only as to the expert and medical records specifications.

## III.

### STANDARDS FOR FEDERAL HABEAS REVIEW AND INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) codifies the standard for federal habeas review of state court decisions.

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This is a "difficult [standard] to meet." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). It is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Id.* (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). AEDPA "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'" not as a means to correct ordinary error. *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 322 n.5 (1979) (Stevens, J., concurring in judgment)).

To obtain habeas relief under § 2254(d)(1) the petitioner must establish a state court's application of United States Supreme Court holdings is "'objectively unreasonable,' not merely wrong." *Ervin v. Bowersox*, 892 F.3d 979, 983 (8th Cir. 2018) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014), in turn quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). "A state court 'unreasonably applies' Supreme Court precedent if it 'identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Worthington v. Roper*, 631 F.3d 487, 495 (8th Cir. 2011) (brackets original to *Worthington*), in turn quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see Ali v. Roy*, 950 F.3d 572, 574 (8th Cir. 2020) (quoting *White v. Dingle*, 757 F.3d 750, 754 (8th Cir. 2014), in turn quoting *Williams*, 529 U.S. at 405, 413).

When considering challenges to state court factual findings, a federal court on habeas review must "presume the [state] court's factual findings are correct unless [petitioner] 'rebut[s] the presumption . . . by clear and convincing evidence.'" *Stephen v. Smith*, 963 F.3d 795, 800 (8th Cir. 2020) (quoting 28 U.S.C. § 2254(e)(1) (third brackets original)).

The Iowa Court of Appeals[12] and PCR trial court applied clearly established United States Supreme Court precedent to Hansen's ineffective assistance of counsel claims. No specific factual finding is challenged.[13]  The issue before this Court is thus whether, under § 2254(d)(1), the Court

---

[12] The Iowa Supreme Court denied further review of the Iowa Court of Appeals' decisions in *Hanson I* and *II* without giving reasons. Denial of further review by the Iowa Supreme Court is not a decision on the merits. Only *Hansen II* concerned Hansen's ineffective assistance of counsel claims. Consequently, that decision is the "last reasoned decision" of the Iowa courts and as such is the focus of federal habeas review. *Worthington*, 631 F.3d at 497. Even if the Iowa Supreme Court's denial of further review were considered a decision on the merits, this Court would look through the decision to *Hansen II* on the assumption the Supreme Court adopted the same reasoning as the Iowa Court of Appeals. *See Wilson v. Sellers*, ___ U.S. ___, ___, 138 S. Ct 1188, 1192 (2018).

[13] In connection with his argument on each part of his ineffectiveness claim, Hansen adds a conclusory statement that the Iowa Court of Appeals made an unreasonable determination of facts. As noted, he does not challenge any specific factual finding. In substance, he argues the court's

of Appeals' application of the governing law was unreasonable. *See Richter*, 562 U.S. at 101.

Reasonableness is governed by an objective standard. *Williams*, 529 U.S. at 409. "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## B.

The Sixth Amendment to the U.S. Constitution gives criminal defendants the right to have

the assistance of counsel for their defense. "[T]he right to counsel is the right to the effective

assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v.*

*Richardson*, 397 U.S. 759, 771 n.14 (1970)). "The benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result." *Id*. Counsel

is "strongly presumed" to have provided adequate assistance "and made all significant decisions

in the exercise of reasonable professional judgment." *Id*. at 690; *see Cullen*, 563 U.S. at 189

(quoting *Strickland*).  Establishing that a state court's application of *Strickland* was unreasonable

is particularly difficult.

> The standards created by *Strickland* and § 2254(d) are both "highly deferential,"
> and when the two apply in tandem, review is "doubly" so[.] The *Strickland* standard
> is a general one, so the range of reasonable applications is substantial. Federal
> habeas courts must guard against the danger of equating unreasonableness under
> *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable. The question is whether
> there is any reasonable argument that counsel satisfied *Strickland*'s deferential
> standard.

---

rejection of the various parts of his claim must have been based on factual error. (*See* Pet'r's Brief
[10] at 33, 36, 41).

*Richter*, 562 U.S. at 105 (citations omitted); *see also Stephen*, 963 F.3d at 799-800. This standard applies regardless of whether the state court decision under review addressed an issue raised by petitioner. The Petitioner must show "there was no reasonable basis . . . to deny relief." *Richter*, 562 U.S. at 98.

As noted, the Iowa Court of Appeals did not specifically address any of the three ineffectiveness specifications presented here. The PCR trial court addressed two, finding counsels' decisions not to retain an expert or obtain medical records were consistent with the defense strategy. In affirming the PCR trial court the Court of Appeals presumably adopted this reasoning. *See Wilson*, 138 S. Ct. at 1192; *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). This seems evident in view of the appellate court's view that the central issue was the choice of strategy.

*Strickland* adopted the now familiar two-pronged proof requirement for ineffective assistance of counsel claims. A convicted defendant challenging his conviction on this ground must "show that his counsel was deficient and that his counsel's deficient performance prejudiced him." *Slocum v. Kelley*, 854 F.3d 524, 532 (8th Cir. 2017) (citing *Strickland*, 466 U.S. at 687-88, 694). Deficient performance is that which falls below an objective standard of reasonableness. *Barnett v. Roper*, 904 F.3d 623, 631 (8th Cir. 2018) (citing *Slocum*, 854 F.3d at 532, in turn citing *Strickland*, 466 U.S. at 687-88, 694). Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Slocum*, 854 F.3d at 532 (quoting *Strickland*, 466 U.S. at 694). The likelihood of a different result must be "substantial, not just conceivable." *Id*. (quoting *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012), in turn quoting *Richter*, 562 U.S. at 112). If either prong of the *Strickland* test is not established, a court need not address the other. *Stephen*, 963 F.3d at 800 (citation omitted); *see State v. Russell*, 897 N.W.2d 717, 730 (Iowa 2017) (applying same principle in Iowa state court adjudications).

The Iowa Supreme Court analyzes ineffective assistance of counsel claims under the two-pronged *Strickland* test, *see State v. Ross*, 845 N.W.2d 692, 697-98 (Iowa 2014), though it has articulated the first prong differently in terms of a failure "to perform an essential duty." *See Russell*, 897 N.W.2d at 730. Failure to perform an essential duty is established by evidence counsel's performance was "below the standard demanded of a reasonably competent attorney." *Id*. (quoting *Ledzema v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (in turn citing *Strickland*, 466 U.S. at 688). This is not materially different than *Strickland*'s requirement of a showing that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  In *Hansen II* the Iowa Court of Appeals equated the essential duty standard with the first prong of the *Strickland* test. 2017 WL 6027770 at *2.

## IV.

## DISCUSSION

## A.

**Choice of Defense**

Hansen argues that as a result of the three failures he attributes to his attorneys, they "did not present the admitted singular viable defense theory of the case (based on his abuse and [his] mental state)," namely that "he shot Gerot under the heat of passion/anger (that is, without malice)." (Pet'r's. Brief [10] at 26-27). It is not clear if by this Hansen means to challenge the Iowa Court of Appeals' holding that his counsel made a reasonable strategic decision to pursue only an involuntary manslaughter defense. If it is, it fails because the court's decision was clearly a reasonable application of the *Strickland* deferential standard.

Hansen's counsel chose a theory of defense based on involuntary manslaughter because that defense was most consistent with what Hansen told Agent Uhlmeyer and repeatedly maintained thereafter—that he did not intend to shoot Gerot and her death was an accident.

Counsel considered voluntary manslaughter (and other defenses) (PCR Tr. 58-59), but voluntary manslaughter's first element, that Hansen intentionally shot Gerot, was inconsistent with the unintentional, accidental shooting Hansen described to Uhlmeyer and counsel. Also, conceding an intent to shoot Gerot was a step closer to specific intent to kill, a central element of first-degree murder. (*Id.* at 57; Jury Inst. 17, App'x 307 [8-2]).

Both defenses presented difficulties. In the immediate aftermath, Hansen did not exclaim to neighbor Hahn or arriving law enforcement that the shooting was accidental, as might ordinarily be expected. If Hansen did not aim the gun at Gerot, he certainly pointed it at her. Apart from being inconsistent with the unintentional shooting described by Hansen, voluntary manslaughter requires not just passion, but a "sudden, violent and irresistible passion resulting from serious provocation" without an interval of time during which a reasonable person would gain control and suppress the impulse to kill. Iowa Code § 707.4(1). "Words alone, however abusive or insulting, cannot be serious provocation." (Jury Inst. 30, App'x 314 [8-2]). That Hansen said his blood was boiling and he was seeing red was some evidence he acted in the heat of passion, but his testimony about his thought process after Gerot's final push in the garage, that he had to get her to leave and to do so he would discharge a firearm to scare her, would not have squared easily with a sudden impulse to kill resulting from the kind of extraordinary passion voluntary manslaughter demands. Also, the time it took to retrieve the gun and travel through the house to the sliding patio door was arguably enough for Hansen to collect himself. In *Hansen I* the Iowa Court of Appeals included the time it took Hansen to arm himself and walk through the garage and kitchen to the sliding patio door in the substantial evidence it said supported malice aforethought. *Hansen I*, 2014 WL 1495493 at * 5.

Counsel was faced with a strategic choice between two difficult defenses in an uphill case in which their client admitted shooting the victim in the head. Their decision was reasonably

informed and consistent with Hansen's oft-repeated story that he did not intend to shoot Gerot. It is apparent a reasonable argument can be made that the choice to defend solely on the basis of involuntary manslaughter was not deficient under the deferential *Strickland* standard.

Because counsel made a reasonable strategic decision to put forward an involuntary manslaughter defense, assessment of the three specifications of Hansen's ineffectiveness claim must be made in light of how each bears on that defense.

**Mental State Expert**

**1.**

Hansen argues his "singular viable basis of the defense" to murder was that "he did not have the mental state (malice aforethought)" to commit murder, a defense which required counsel to consult with an expert psychiatrist or psychologist in an effort to establish his mental state was that he shot Gerot in the heat of passion. (Pet'r's Brief [10] at 31-33). Thus framed the argument focuses primarily on the alleged need to pursue expert testimony that Hansen acted in the heat of passion.

Hansen presented testimony from long time, noted Iowa criminal trial lawyer William Kutmus. Kutmus agreed involuntary and voluntary manslaughter were the two potential defenses. (PCR Tr. 77-78). In his opinion, a competent attorney would consult a psychiatrist or psychologist to explain Hansen's mental state at the time he shot Gerot. He believed it was critical to show Hansen acted in the heat of passion in order to mitigate the element of malice aforethought, (PCR Tr. 93, 94, 99), but Kutmus would have defended on both voluntary and involuntary manslaughter. (PCR Tr. 95-96).

On the basis of his record review, interview with Hansen, and various psychological tests, Hansen's PCR expert, Dr. Rypma, gave two related opinions about Hansen's mental state at the time he shot Gerot. Rypma testified that as a result of Gerot's abuse Hansen experienced a single

18

episode of disassociation in which he "snapped" and became disconnected from reality. (Rypma Tr. 14, 29). Acting in the heat of passion, he did something totally out of character. (Rypma Tr. 14, 30-31). "[H]is passionate anger was operating in such a way as to have caused him or to have allowed him to behave in a way that he had never behaved ever once in his life prior to that." (Rypma Tr. 63).

Attorney Cohen testified his co-counsel, Robertson, attempted to find an expert to testify about the abuse Hansen had suffered from Gerot. Robertson contacted a Kirsten Faisal of the Iowa Coalition Against Domestic Violence and sent her case materials to see if some type of "battered person syndrome" defense could be developed. (PCR Tr. 25, 45; PCR Ex. 6, App'x 255-56 [8-2]). Faisal informed Robertson she did not think she could be helpful in developing a theory that Hansen acted in self-defense against Gerot as a batterer. The circumstances, she would later write, did not present the level of "lethality risk" sufficient to support such a defense. (PCR Ex. A (9/8/15 ltr. Faisal to county attorney, App'x 270-71 [8-2], rec'd subject to objection (PCR Tr. 47)). Cohen testified he and Robertson went over every defense they could think of, including other mental health defenses such as insanity and diminished responsibility, but rejected them as unsupportable. Hansen had no mental health disorders of which counsel were aware, he had not used drugs that day, and did not drink. (PCR Tr. 59).

**2.**

Absence of malice was the object of Hansen's defense, but not the defense itself. He had two realistic defenses open to him; involuntary or voluntary manslaughter. His counsel reasonably chose to defend solely on the basis of involuntary manslaughter. Involuntary manslaughter is reckless conduct which unintentionally causes the death of another. The defendant's mental state is not directly in issue, though recklessness and lack of intent to kill both have to do with what was going through the defendant's mind.. Recklessness was necessarily admitted in arguing for

involuntary manslaughter. It took no expert to opine it is reckless to discharge a firearm in the direction of another to scare the person. Expert testimony that Hansen shot Gerot in the heat of passion would not have helped show Hansen unintentionally caused Gerot's death, quite the opposite. Killing in the heat of passion was most consistent with an intentional shooting of Gerot. The Iowa Court of Appeals could have reasonably believed expert testimony that Hansen shot Gerot in the heat of passion was not critical, indeed of little relevance, to the involuntary manslaughter defense, and very possibly inconsistent with it.

Expert testimony that Hansen experienced an episode of disassociation in which he acted out of character in the heat of passion would have given some additional support to Hahn's testimony about Hansen's demeanor, the gist of what the many character witnesses had to say, and Hansen's own testimony, all to the effect that he was not himself when he shot Gerot. While corroborative of the other evidence that Hansen acted out of character, the Iowa Court of Appeals could also have reasonably seen the connection between disassociation and the opinion that Hansen shot Gerot in the heat of passion as unhelpful to the claim the shooting was an accident.

The involuntary manslaughter defense depended on convincing the jury to accept Hansen's story that he only intended to scare Gerot, not harm her. On this, Dr. Rypma testified in substance that disassociation did not prevent Hansen from acting with the intent Hansen described. (Rypma Tr. 55-56). Rypma believed what Hansen said about his intent; that he meant to scare Gerot, not shoot her. (Rypma Tr. 56). It was not necessary to introduce the concept of disassociation if it was not helpful in establishing the central issue of the defense.

As Hansen notes, there are criminal cases "where the only reasonable and available defense strategy requires consultation with experts." *Richter*, 562 U.S. at 106. He cites as one example, *Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017). There the mental state of a fourteen-year-old girl charged with felony murder was front and center, requiring counsel to investigate potential

expert psychological evidence. *Id*. at 1070. The failure to do so was deficient. *Id*. Unlike the defendant in *Weeden*, Hansen's mental state was not critical to his defense. Hansen had only two available, but quite different, defense strategies. Hansen's counsel chose the one most consistent with what Hansen told the DCI and his attorneys, a defense that did not require consultation with an expert to provide psychological evidence of a state of mind influenced by the heat of passion.

Given the limited relevance and possible harm to the involuntary manslaughter defense, the Iowa Court of Appeals could reasonably conclude Hansen's trial counsel were not deficient for failing to pursue state of mind expert opinions like those given by Dr. Rypma. The court had a reasonable basis to deny relief on this ground.

**Witness Abuse Testimony**

### 1.

Hansen argues his trial counsel were ineffective for failing to call lay witnesses known to them who could corroborate Hansen's testimony about Gerot's abuse of him.

At the PCR hearing attorney Cohen testified he interviewed forty-five to fifty witnesses, in each case asking about physical or verbal abuse of Hansen by Gerot they may have witnessed. (PCR Tr. 19, 30). Hansen had given his lawyers a lengthy list of potential character witnesses, people he was personally or professionally close to. (PCR Tr. 135-37). A number of these spoke of Gerot belittling Hansen in front of them. (PCR Tr. 18). At least seven had observed Gerot verbally abusing Hansen and/or, as the Court understands Cohen's testimony, physical injuries to Hansen. (PCR Tr. 19, 21). Though witnesses described physical injuries, none saw Gerot inflict them. When they asked Hansen about the injuries, he would give some innocent explanation not involving Gerot. (PCR Tr. at 49).

An investigator working for Cohen's office also interviewed potential witnesses. (PCR Tr. 21). One of these was Gerot's former husband, Ronnie Gerot, who said he had been physically and verbally abused by his ex-wife. (PCR Tr. 22).

Some of the witnesses who provided information about Gerot's abuse of Hansen testified at trial as character witnesses. No testimony was elicited from them about the subject. (PCR Tr. 20). No other witnesses with similar knowledge were called to testify, though they were available. No testimony was presented from Ronnie Gerot. The omission was intentional. Cohen testified:

> Q. And obviously -- did you make a conscious tactical decision as to that?
> A. It was a conscious tactical decision. I discussed it with Mr. Robertson, and we agreed that if we introduced absolutely all the evidence of all the offenses that Mr. Hansen had suffered at her hands and all the witnesses testifying about their observations, that it might – it might help the State establish everything it needs to in terms of malice aforethought, that Sharon Gerot acted so horribly toward Tom Hansen that he wanted to kill her and that's what he really wanted to do when he fired that shot.
> Q. And also as to specific intent, right?
> A. Everything: Specific intent, deliberation, premeditation, malice aforethought. There was enough evidence there, if we put everything in, that he really did hate her and he really wanted to get rid of her.
> Q. And perhaps that conclusion might be even more magnetic to a jury, given what kind of person Tom Hansen was -- otherwise nonviolent, otherwise well-respected in the community; and yet, with respect to this person, we can all understand essentially why he wanted to kill her?
> A. And it would reinforce the State's case on those issues.
> Q. So that was the tactical decision that you made?
> A. Yes.

(PCR Tr. 48-49).

Only Margaret and Jerold Sweeting, Hansen's across-the-road good friends and neighbors, testified at the PCR hearing about Gerot's abuse of Hansen. Both saw Hansen and Gerot interact. Mrs. Sweeting described Gerot as "very, very verbal" and mean to Hansen, prone to emotionally explode. (PCR Tr. 107). Gerot cursed a lot. (PCR Tr. 108). Mrs. Sweeting said she saw Gerot belittling Hansen weekly. (PCR Tr. 108-09). On one occasion, Mrs. Sweeting saw Hansen with his face red and scarred. Hansen told Mrs. Sweeting Gerot had hit him with a frying pan. (PCR Tr.

109). On another, Mrs. Sweeting saw Gerot and Hansen trying to maneuver horses into a trailer. She saw Gerot push Hansen back and hit him with her whip on the side of his shoulder, though Mrs. Sweeting could not tell if the whip was meant for a horse. (PCR Tr. 110).

Mr. Sweeting testified but did not have much to say about witnessing Gerot's verbal or physical abuse of Hansen. He said he saw Hansen's face skinned up numerous times. (PCR Tr. 122). He said sometimes Gerot was nice and at other times she would "just fly off the handle." (PCR Tr. 124).

Mr. and Mrs. Sweeting were contacted by Hansen's counsel, and/or their investigator, on multiple occasions, and provided information generally consistent with their testimony. (PCR Tr. 111, 118, 124). Cohen testified he personally spoke with either Jerold or Margaret Sweeting. (PCR Tr. 22).[14]

## 2.

Following interviews with witnesses who claimed some knowledge of Gerot's verbal abuse of Hansen and/or, if they did not observe Gerot striking Hansen, had seen physical injuries on his body, defense counsel made a conscious strategic decision not to offer the evidence for fear it could support the malice aforethought elements of first- and second-degree murder (as well as the other mens rea requirements of first-degree murder) by giving Hansen a motive to kill Gerot. Instead counsel relied on extensive evidence of Hansen's honest and non-violent character to argue he ought to be believed when he said he did not intend to shoot Gerot.

"Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight." *Forrest v. Steele,* 764 F.3d 848, 858 (8th Cir.

---

[14] A memorandum of information provided by Mr. and Mrs. Sweeting in in-person interviews with counsels' investigator was an exhibit at the PCR hearing. (PCR Ex. 7A, App'x 257-58 [8-2]; *see* PCR Tr. 21).

2014) (quoting *Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) in turn quoting *Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir. 1990) (en banc)). In assessing defense counsel's performance, the Court must take care to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (citing *Strickland*, 466 U.S. at 689).

*Strickland* also instructs that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Since *Strickland* the Eighth Circuit has "consistently held that a reasoned decision not to call a witness 'is a virtually unchallengeable decision of trial strategy.'" *Rodela-Aguilar v. United States*, 596 F.3d 457, 464 (8th Cir. 2010) (quoting *Staples*, 410 F.3d at 488-89); *see also Ford v. United States*, 917 F.3d 1015, 1024 (8th Cir. 2015) (citing *Staples*, 410 F.3d at 488).

Testimony from Hansen's friends, neighbors, and associates about Gerot's verbal abuse of Hansen witnessed by them could have provided some corroboration of Hansen's testimony about Gerot's abusive conduct on the day of the shooting and before. Proof problems would have attended any corroborative testimony about physical abuse. The injuries others saw were unexplained, or explained away by Hansen. Mrs. Sweeting knew only what Hansen told her about the frying pan injury.  What she saw about Gerot's use of the horsewhip is unclear.

If there was some risk extensive testimony from others about Gerot's verbal abuse of Hansen could lead the jury in the wrong direction toward malice aforethought or worse, first-degree murder, many attorneys might nonetheless have opted to present limited testimony to corroborate Hansen while endeavoring to do so in a way that did not paint Gerot, in Cohen's words, as having acted "so horribly" toward Hansen that he wanted to kill her. That other lawyers might have taken a different path with the abuse evidence does not mean that chosen by Hansen's counsel

amounted to deficient performance. The PCR record is consistent with a finding Hansen's counsel made a reasoned judgment call with full knowledge following adequate investigation. With the shooting admitted and the defense dependent on convincing the jury it was unintentional, counsel's concern about the risk involved in testimony emphasizing the victim's abuse of Hansen was plausible. Viewed from counsels' perspective at the time, a reasonable argument can be made that their decision to forego the witness abuse testimony was not deficient under the deferential *Strickland* standard. It follows Hansen has not shown the Iowa Court of Appeals lacked a reasonable basis to deny relief on this part of his ineffectiveness claim.

**Medical Records**

Hansen argues counsel were ineffective for failing to investigate or attempt to obtain Gerot's medical and pharmacological records and submit them for review by an expert. He contends the records and expert testimony about them would have corroborated his claims of abuse.

Hansen told his attorneys he thought Gerot had a bipolar disorder and was paranoid. On more than one occasion he asked them to obtain her medical records. (PCR Tr. 30-31, 139). Counsels' office had obtained a Ziploc plastic bag containing Gerot's pill bottles which identified the medications, the professionals prescribing them, and the pharmacies where obtained. (PCR Tr. 32-33). Cohen testified he did not know they had the pill bottles. (PCR Tr. 84).

Hansen's counsel did not seek Gerot's medical records because, as Cohen testified, he did not think they had a good faith basis to request them under the governing statute, Iowa Code § 622.10(4). (PCR Tr. 31, 54). Hansen's belief Gerot was bipolar was not enough. (PCR Tr. 31). Medical records are confidential. Absent waiver, in order to obtain disclosure of medical records in a criminal case the defendant must file a motion which in good faith demonstrates a reasonable probability the information sought is likely to contain exculpatory information not otherwise

available and there is a "compelling need for the defendant to present a defense . . ." Iowa Code § 622.10(4)(a)(2)(a). If defendant establishes reasonable probability and compelling need the court must review the records in camera to determine whether they in fact contain exculpatory information. *Id*. That the trial court would have granted such a motion is speculative, but the PCR court did and the records were in evidence at the PCR hearing.

Gerot's medical records revealed she had a history of severe depression and chronic pain. She obtained prescription medication for both. The pain medications included opioids Darvocet and Codeine. (Rypma Tr. 36). Dr. Rypma thought the course of Gerot's medical history demonstrated overuse of opioid medication. (Rypma Tr. 72). He noted that one of Gerot's medical providers expressed concern about addiction and wrote that Gerot needed to cut back on pain medication. (Rypma Tr. 54). Apparently, this referred to a 2006 nurse practitioner note. (Rypma Tr. 70-71; PCR Ex. 3, App'x  223 [8-2]). However, more recent medical evidence indicated Gerot did not abuse opioids. In an April 2008 note, Gerot's treating physician wrote that Gerot "does not seem to be abusing her narcotic medications nor is she 'addicted to them.'" (PCR Ex. 3, App'x 227 [8-2]; *see* Rypma Tr. 70). Cohen testified that toxicology tests taken on autopsy found Alprazolam, Codeine and Tramadol in Gerot's body. In a deposition prior to the criminal trial, the examiner testified all were within, or below the normal therapeutic range. (PCR Tr. 52).

Dr. Rypma's ultimate medical records opinion was that persons like Gerot who both suffer from depression over a long period of time and use high dosages of opioid medication to control pain are prone to enhanced irritability and impulsivity, characteristics consistent with a  perpetrator of domestic violence. (PCR Tr. 69).

In the Court's judgment, Hansen has not shown the absence of any reasonable basis for the Iowa Court of Appeals to deny relief based on counsel's alleged deficient performance in failing to seek Gerot's medical records and pursue expert testimony concerning them. If counsel should

have been aware of the bag of pill bottles, they did know from Gerot's autopsy what medication she had been taking. They knew Gerot had opioids in her system, but below or within therapeutic levels. They decided against seeking Gerot's medical records because they thought they lacked a good-faith basis to pursue them under Iowa law. That the PCR court allowed disclosure of the records does not mean it was unreasonable for counsel at the time of trial to believe they lacked an adequate basis to request them. Reasonable attorneys may disagree, but counsel made a deliberate decision based on their understanding of the law.

Had counsel obtained the medical records and submitted them to an expert the result, if consistent with Dr. Rypma, would have been expert testimony that Gerot's long-term depression and use of opioids made her more irritable, impulsive, capable of inflicting domestic abuse. This evidence would have lent some support to Hansen's testimony about Gerot's abusive behavior. Though helpful, a reasonable argument can be made that the corroborative value was not so critical as to have required pursuit by counsel in the exercise of reasonable professional judgment. The medical records and expert testimony concerning them would have had no direct bearing on the central issue of the involuntary manslaughter defense--whether Hansen intended to shoot Gerot.

## B.

The Iowa Court of Appeals did not address the prejudice prong of the *Strickland* inquiry. The PCR trial court did, but only to the extent of saying that if counsel had obtained the medical records "it does not appear to the Court the records would have made a difference in the outcome of the case as there was no evidence in the record[15] of Gerot having a violent or aggressive character." (PCR Ruling, App'x 101 [8-2]).

---

[15] The PCR trial court may have been referring to Gerot's medical records which contained no evidence she was "violent [or] aggressive." (Rypma Tr. 73).

As Hansen did not establish the performance prong of *Strickland*, the Iowa courts were not required to address prejudice, nor is this Court. Hansen claims prejudice, the PCR trial court addressed one aspect, and in the context of a Report and Recommendation it is appropriate to consider both components of *Strickland*.

The United States Supreme Court has held AEDPA deference does not extend to a *Strickland* prong not relied on by the state courts. Federal habeas review of an unadjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 38 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Weeden*, 854 F.3d at 1071. There is some question whether this remains the case after the Court's statement in *Richter* that § 2254(d) deference applies regardless of whether "the state court reveals which of the elements in a multipart claim it found insufficient." 562 U.S. at 98. *See, e.g., McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 100-01 n.10 (3d Cir. 2012), *cert. denied*, 568 U.S. 1147 (2013); *see also Carter v. Duncan*, 819 F.3d 931, 950 (7th Cir. 2016) (Easterbrook, J. concurring). Deference would of course extend to the PCR trial court's conclusion that access to the medical records would not have made a difference.

The applicable standard for review makes no difference because in this Court's judgment, whether considered de novo or with § 2254(d) deference, Hansen has not shown a reasonable probability that but for the alleged deficiencies in his counsels' performance the result of his criminal trial would have been different. For three reasons the Court believes there is no substantial likelihood of a different result.

First, abundant evidence supported the jury's second-degree murder verdict. The starting point and significant hurdle for any defense were the unavoidable facts that Hansen shot Gerot in the head with a handgun while she was mowing.

Second, as previously discussed, Hansen's description of the occurrence and what he said or did not say in the immediate aftermath were in key respects problematic for his two possible defenses, voluntary and involuntary manslaughter. *See supra* at 17-18. Not only were both defenses difficult to maintain on the facts presented, one aspect of the law was a further significant difficulty. The jury was instructed that malice aforethought could be inferred from defendant's use of a dangerous weapon, and a handgun is a dangerous weapon. (Jury Inst. 22, 23, App'x 309 [8-2]). Use of the gun was enough.

Third, and last, in finding Hansen guilty of second-degree murder the jury found the State had not proved first-degree murder. Counsels' defense was partially successful, if a Pyrrhic victory. The jury must have found Hansen did not act "willfully, deliberately, premeditatedly and with a specific intent to kill," the distinguishing element of first-degree murder. (*Compare* Jury Inst. 17 *with* Jury Inst. 26, App'x 307, 311 [8-2]). Hansen's testimony gave them the basis to do so. It is therefore likely the jury credited Hansen's testimony to some degree. Indeed, the jury could have believed everything the character witnesses said about Hansen, and everything Hansen said about the verbal and physical abuse he suffered from Gerot and the events leading up to the shooting, except only his claim the shooting was accidental, and still found him guilty of second-degree murder.

The undisputed facts, the difficulties attending the two potential defenses, and the indication the jury believed some of Hansen's story combine to make it doubtful any of the additional evidence Hansen claims his counsel should have put forward would have changed the result.

## V.

## CONCLUSION, RECOMMENDATION, AND ORDER

For the reasons given above, and applying the standards for federal habeas review of State court adjudications provided for in 28 U.S.C. §§ 2254(d)(1), (2), Petitioner has failed to establish he is in custody in violation of the Constitution or laws of the United States. Accordingly, it is RECOMMENDED that the Petition for a Writ of Habeas Corpus be dismissed and judgment be entered accordingly.

IT IS ORDERED that the parties have the time allowed by 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72 and LR 72A to file written objections to the Report and Recommendation. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated October 9, 2020.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE